UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| THE PRUDENTIAL INSURANCE COMPANY,<br><br>Plaintiff(s),<br><br>v.<br><br>FAITH LEE, et al.,<br><br>Defendant(s). | Case No. 2:17-CV-900 JCM (VCF)<br><br>ORDER |

Presently before the court is defendant Petra Wilson's motion for summary judgment. (ECF No. 61). Defendant Faith Lee filed a response (ECF No. 62), to which Wilson replied (ECF No. 64).

Also before the court is Lee's motion for summary judgment. (ECF No. 66). Wilson filed a response (ECF No. 68), to which Lee replied (ECF No. 70).

**I.     Background**

The instant case arises from competing claims to Rex Wilson's ("the decedent") life insurance policy for $125,000 ("the death benefit"). (ECF No. 1). The claimants are Faith Lee, the decedent's mother, and Petra Wilson, the decedent's wife.[1] *Id.*

*a.  The decedent's Veterans Group Life Insurance ("VGLI") coverage*

Prudential Insurance Company of America ("Prudential") is a private insurance carrier that provided Group Life insurance benefits pursuant to 38 U.S.C. § 1965 *et seq.*, the Servicemembers' Group Life Insurance statute ("the SGLI statute"), to the United States Department of Veterans

---

[1] Rex Wilson's children were also named as defendants; however, they have since disclaimed and released any rights to assert a claim to the death benefit. (ECF No. 50).

**James C. Mahan**
**U.S. District Judge**

Affairs ("the SGLI plan"). *Id.* As a member of the United States Marine Corps, the decedent was eligible for coverage under the SGLI plan, which later provided him with VGLI coverage. *Id.*

A VGLI beneficiary designation or change is subject to the provisions of 38 U.S.C. §§ 1970 and 1977 as well as 38 C.F.R. § 9.4. Under 38 U.S.C. § 1977(d), "[a]ny amount of [VGLI] in force on any person on the date of such person's death shall be paid, upon the establishment of a valid claim therefor, pursuant to the provisions of section 1970 of this title." According to 38 U.S.C. § 1970(a), "[a]ny amount of insurance under this subchapter in force . . . on the date of the insured's death shall be paid, upon the establishment of a valid claim therefor, to the person or persons surviving at the date of the insured's death," starting with "the beneficiary or beneficiaries as the member or former member may have designated by a writing received prior to death . . . in the administrative office."

This statutory language comports with the SGLI statute's requirement that "any designation of beneficiary or beneficiaries for [VGLI] to be effective must be a writing signed by the insured and received prior to death by the administrative office." 38 U.S.C. § 1977(d). While "[a] change of beneficiary may be made at any time and without the knowledge or consent of the previous beneficiary," "[a]ny designation of beneficiary . . . will remain in effect until properly changed by the member or canceled automatically." 38 C.F.R. § 9.4.

*b. Factual background*

On or about December 29, 2005, the decedent designated Wilson as the sole primary VGLI beneficiary via the VGLI website ("the first designation"). *Id.*

In February of 2016, after twenty-eight years of marriage, the decedent and Wilson separated. (ECF Nos. 61, 62). Wilson alleges that after their separation, the decedent "began spiraling out of control." (ECF No. 68). She claims that he exhibited "drastic changes and uncharacteristic behaviors," including losing weight due to an antihistamine addiction; falling asleep during conversations; speaking with invisible people; telling his boss and neighbors he had a terminal illness when he did not; losing his job and living out of his car; using the water hose in her front yard to shower; ringing her doorbell and texting or calling her at all hours and leaving incoherent voicemails; defecating in her driveway and throwing a bag of feces from his car into

the street in front of her house; stealing and pawning personal and family items; and "prostituting himself on Craigslist to other men and transsexuals." (ECF No. 68 at 5-6). Wilson alleges that the decedent was addicted to drugs, alcohol, and gambling. *Id.* at 6.

Following the marital separation, Lee supported her son, the decedent, financially. (ECF No. 62 at Ex. A, Ex. F). Lee alleges that based on discussions with the decedent, she came to understand that he would pay her back for the money loaned to him during this time. (ECF No. 62 at Ex. A). Lee further alleges that in September of 2017, the decedent contacted her to verify her social security number so that he could designate her as a beneficiary under his VGLI coverage. *Id.*

On October 4, 2016, the decedent contacted Prudential via phone to inquire about adding his mother as a beneficiary under his VGLI coverage. (ECF No. 66, Ex. B at 14). During this conversation, the decedent inquired as to whether this change would be effective immediately. *Id.* at 16. In response, the Prudential representative indicated that the beneficiary change can take up to five days to process and that Prudential "go[es] by the date that the signature is on it. So by the date that you sign the document is the date that [Prudential] go[es] by." *Id.* As a result of this phone conversation, Prudential e-mailed the decedent a VGLI beneficiary designation/change form ("the beneficiary change form"). (ECF Nos. 61, 62).

The decedent completed the beneficiary change form, allegedly designating Lee as the primary beneficiary of 50% of the VGLI coverage and Wilson as the primary beneficiary of the remaining 50% of the VGLI coverage[2] ("the second designation"). (ECF Nos. 1 at Ex. A, 61, 62). The bolded language immediately underneath the signature line advised that "[t]he signature date must be the date the Veteran actually signed the form." (ECF No. 1, Ex. A). Nonetheless, the

---

[2] The percentage allegedly allocated to Wilson is in dispute. (ECF No. 61). Wilson maintains that her designation could be read as either 50% or 80%. *Id.* Wilson therefore alleges that "the [beneficiary] change form is subject to challenge as the beneficiary sums total greater than 100%." *Id.* at 3. Lee responds that the decedent unambiguously indicated a total of 100% and that the first digit in the handwritten percentage at issue resembles the "5" in his telephone number more than the "8" as written on the envelope in which he mailed the beneficiary change form. (ECF No. 70). According to Lee, the beneficiary change form clearly designates Wilson as the primary beneficiary of 50% of the death benefit. *Id.*

- 3 -

decedent post-dated the beneficiary change form for October 1, 2016. *Id.* On October 6, 2017, the decedent mailed the form to Prudential. (ECF Nos. 61, 62). Prudential received the form five days later, on October 11, 2016, and changed the decedent's beneficiaries accordingly. (ECF Nos. 1 at Ex. A, 61).

The decedent became the primary suspect in a series of sixteen robberies that spanned from October 3, 2016 through October 12, 2016. (ECF No. 61, Ex. 4). On October 8, 2016, the decedent sent Wilson a text message reading: "Goodbye [Petra]. You and the kids were the best things that ever happened to me. I will always love you." *Id.* at 7. Understanding the decedent to be suicidal, Wilson filed a missing person report. *Id.*

On October 12, 2016, Las Vegas Metropolitan Police Department officers attempted to make a felony car stop on a stolen vehicle driven by the decedent. (ECF No. 61, Ex. 4). A high speed chase ensued. *Id.* After approximately twenty minutes, the officers were able to stop the decedent and position three patrol cars to keep him from fleeing. *Id.* As the officers exited their vehicles, the decedent raised and pointed what appeared to be a firearm at them. *Id.* Four officers opened fire. *Id.* When they approached the vehicle, the officers observed what appeared to be a firearm[3] in the decedent's right hand and the word "sorry" written in blood on the vehicle's center console. *Id.* The decedent died from multiple gunshot wounds at the scene. *Id*. The autopsy revealed that he was intoxicated via cocaine at the time of the incident.[4] *Id.*

The decedent's certificate of death lists his date of death as October 13, 2016. (ECF No. 1, Ex. B). As a result of his death, death benefits in the amount of $125,000 became payable under the decedent's VGLI coverage. (ECF No. 1).

On October 31, 2016, Wilson, through her counsel, sent a letter to Prudential contesting the second designation and requesting that Prudential withhold the death benefit. *Id.* On December 9, 2016, Lee made a claim to the death benefit by mailing a claim for death benefits form to

---

[3] "It was later determined that the item in [d]ecedent's hand was not a firearm but rather a black spray nozzle with black duct tape wrapped around the nozzle head in a manner that mimicked the look of a handgun." (ECF No. 61, Ex. 4 at 6).

[4] The decedent also had a blood alcohol concentration level of 0.051. *Id.*

Prudential. *Id.* On January 23, 2017, Wilson also made a claim to the death benefit by submitting a claim for death benefits form via email. *Id.*

    *c. Procedural background*

On March 30, 2017, Prudential filed its complaint in interpleader, alleging an inability to resolve the competing claims to the death benefit. *Id.*

On August 14, 2017, Magistrate Judge Ferenbach filed a report and recommendation wherein he recommended that (1) Prudential pay into the court $125,000 plus interest accrued and less $6,000 in attorney fees and costs; (2) defendants be enjoined from instituting or prosecuting any proceeding in any state of United States court affecting the death benefit or relevant insurance plan upon Prudential's payment into the court; (3) Prudential be discharged from any and all further liability to defendants relating to the death benefit or relevant insurance plan upon its payment into the court; and (4) Lee's motion for summary judgment (ECF No. 5) be denied. (ECF No. 50).

On August 15, 2017, this court denied Lee's motion for summary judgment because the motion "contain[ed] no citations whatsoever . . . [and] counsel [failed to] attach any evidence to the motion itself." (ECF No. 51 at 2). On September 21, 2017, this court adopted the first three of Magistrate Judge Ferenbach's recommendations and denied the final recommendation as moot. (ECF No. 52). On October 3, 2017, Prudential paid $119,598.84 into the court. (ECF No. 54). Prudential was released from the instant action in accordance with this court's order. (ECF No. 52).

On November 2, 2017, Wilson filed a motion for summary judgment, or in the alternative, for partial summary judgment. (ECF No. 61). Lee responded and also filed her own motion for summary judgment. (ECF Nos. 62 and 66).

**II.    Legal Standard**

The Federal Rules of Civil Procedure allow summary judgment when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A principal purpose of summary judgment is

"to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

For purposes of summary judgment, disputed factual issues should be construed in favor of the non-moving party. *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 888 (1990). However, to be entitled to a denial of summary judgment, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." *Id.*

In determining summary judgment, a court applies a burden-shifting analysis. The moving party must first satisfy its initial burden. "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations omitted).

By contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the non-moving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp.*, 477 U.S. at 323–24. If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

If the moving party satisfies its initial burden, the burden then shifts to the opposing party to establish that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987).

In other words, the nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *See Celotex*, 477 U.S. at 324.

At summary judgment, a court's function is not to weigh the evidence and determine the truth, but to determine whether there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249–50.

### III. Discussion

In support of her request for summary judgment releasing to her the full $119,598.84 held in the court's registry, Wilson argues that the decedent's backdating of the beneficiary change form violates the strict compliance standard under which SGLI beneficiary designations are evaluated, thereby rendering the second designation invalid. *Id.* In the alternative, Wilson requests half of the funds held in the court's registry. In support, she argues that both the first and second designation entitle her to these funds, and no party disputes this entitlement. *Id.*

In response, Lee argues that the decedent's post-dating of the form does not defeat its validity; he was in strict compliance with the SGLI statute; and it would be manifestly unjust for this court to allow a mere technicality to overcome his clear donative intent.[5] (ECF No. 62). Lee also claims that if this court grants Wilson's motion for partial summary judgement, "Lee would not receive 50% of the proceeds lawfully owed to her." *Id.* at 5. In reply, "Wilson maintains [that] a backdated beneficiary change form violates [] 38 C.F.R. § 9.4(a)" and therefore violates the applicable strict compliance standard. (ECF No. 64 at 4). Wilson further maintains that "Lee has no legitimate legal argument to oppose [her] alternative request for relief." *Id.* at 6.

---

[5] Lee further argues that the decedent had the mental capacity to make the second designation; however, Wilson did not raise this issue in her motion for summary judgement. (ECF Nos. 61, 62).

Conversely, in support of her motion for summary judgment, Lee argues that the decedent properly changed the beneficiary designation under his VGLI coverage because he complied with the applicable statutory requirements and had the mental capacity to make this change. *Id.* In response, Wilson argues that "there is a bona fide factual dispute concerning whether [the decedent] was mentally fit to change his beneficiary a week before his death." (ECF No. 68 at 1). Lee maintains in her reply that Wilson has failed to overcome the applicable presumptions of capacity as a matter of law, thereby warranting summary judgement in her favor. (ECF No. 70).

*a. A post-dated beneficiary change form is not improper under 38 C.F.R. § 9.4*

Wilson argues that "[a]s administrator of the [SGLI plan], Prudential retains the authority to mandate what requirements must be satisfied on the [beneficiary change] form in order to properly change the beneficiary" under 38 C.F.R. § 9.4. (ECF No. 61 at 6). Accordingly, the decedent's postdating of the beneficiary change form, which violates Prudential's internal policy and thus allegedly violates the applicable strict compliance standard, is not "proper" under 38 C.F.R. § 9.4, meaning that the first designation remains in effect. *Id.* However, Wilson provides no authority to support her claim that Congress delegated the power to create procedural mandates enforceable under 38 C.F.R. § 9.4 to a private insurance carrier. *Id.*

As argued by Lee, strict compliance with the statute, not the insurance carrier's internal policy, is required. *See Prudential Ins. Co. v. Perez*, 51 F.3d 197 (9th Cir. 1995). In other words, for a VGLI beneficiary change to be effective, the designation must be made via a signed writing that was received by the administrative office prior to the insured's death. 38 U.S.C. §§ 1970 and 1977. *Id.*

In *Perez*, the Ninth Circuit held that, despite the decedent's failure to follow the administrative procedure in place, the change of beneficiary on his VGLI coverage from his wife to his father was effective because the decedent complied with the statutory requirements as set out in 38 U.S.C. §§ 1970 and 1977. *Id.* at 199. After the decedent completed the beneficiary change form, a sergeant signed the document indicating that it was witnessed and received. *Id.* at 198. However, "[c]ontrary to normal procedure," the decedent left with all three copies of the beneficiary change form. *Id.* All three copies were discovered among the decedent's personal

- 8 -

belongings following his suicide. *Id.* The decedent's wife argued that the decedent may have retained the copies because he did not intend to change beneficiaries under his VGLI coverage. *Id.*

The Ninth Circuit held that "the question of why [the decedent] kept the forms is immaterial" because "Congress intended the beneficiary designation provisions of 38 U.S.C. § 1970 to be construed strictly."[6] *Id.* Looking to the statutory requirements as opposed to the administrator's requirements, the *Perez* court further held that "the Air Force 'received' the form designating [the decedent's father] as beneficiary within the meaning of 38 U.S.C. § 1970." *Perez*, 51 F.3d at 199. Moreover, in adopting the reasoning employed by the Fifth Circuit in *Coomer v. United States*, 471 F.2d 1, 6 (5th Cir. 1973), the Ninth Circuit explained that "[s]ince Congress clearly intended to require strict compliance *with the statute* in designating the beneficiary[,] there is no doubt that it also intended to impose similar requirements when the beneficiary is changed." *Perez*, 51 F.3d at 198-99 (quoting *Croomer*, 471 F.2d at 6) (emphasis added).

The Ninth Circuit's holdings in *Perez* make clear that strict compliance with the statutory requirement that a beneficiary change be made in signed writing and received by the administrative office prior to death is required. *See id.*; 38 U.S.C. § 1970(a) (listing as the first in the order of preference "the beneficiary or beneficiaries as the member or former member may have designated by a writing received prior to death . . . in the administrative office") and 38 U.S.C. § 1977(d) (requiring that "any designation of beneficiary or beneficiaries for [VGLI] to be effective must be a writing signed by the insured and received prior to death by the administrative office"). The strict compliance standard does not refer to the administrator's requirements. *See Perez*, 51 F.3d at 198-99.

Here, the decedent complied with the statutory requirements set forth in 38 U.S.C. §§ 1970(a) and 1977(d): The decedent made the second designation in a signed writing that was received (and processed) by the administrative office prior to his death. (*See* ECF No. 1 at Ex. A). Because the decedent complied with these statutory requirements, his form is proper under 38

---

[6] This adherence to strict statutory construction stands in opposition to the previous "liberal policy [which] effectuated a change of beneficiary upon proof of only two conditions: First, that the serviceman intended to change the beneficiary of his particular policy, and second, that he performed some overt act directed toward accomplishing that end." *Hill v. Hill*, 23 Cal. App. 3d 760, 764, 100 Cal. Rptr. 458, 460 (Ct. App. 1972).

C.F.R. § 9.4. *See Perez*, 51 F.3d 199 (statutory requirements that the beneficiary change form be in writing, signed, and received prior to the insured's death were met, and failure to follow the "normal procedure," whereby a copy of the beneficiary change form was placed in the insured's file, was insufficient to render the form invalid). In other words, the decedent's post-dating of the beneficiary change form does not render the form improper under 38 C.F.R. § 9.4. *Id.*

      *b. Genuine issues of material fact exist as to the decedent's capacity*

As noted by the Tenth Circuit, "[t]he question of mental capacity is not addressed in the SGLI Act." *Rice v. Office of Servicemembers' Grp. Life Ins.*, 260 F.3d 1240, 1247 (10th Cir. 2001). The Ninth Circuit has not addressed this question either. Moreover, as noted by a New Jersey district court, "[it does not] appear that there is any widely adopted standard among the federal courts." *Calmon-Hess v. Harmer*, 904 F. Supp. 2d 388, 393 (D.N.J. 2012).

In addressing this statutory gap, the Tenth Circuit held reliance on federal law appropriate because "the SGLI statute . . . preempts state law determining the right to a policy's proceeds" and because "SGLI is a federal program[, and] technically the government rather than the serviceman is the policyholder. [Thus,] we have both a government contract and a federal statute." *Id.* at 1245-46 (quoting *Prudential Ins. Co. of Am. v. Athmer,* 178 F.3d 473, 475 (7th Cir. 1999)). Similarly, a federal district court in Oregon has held that "[b]ecause the insurance policy at issue is a Servicemen's Group Life Insurance Policy, federal law governs the question of mental capacity." *Prudential Ins. Co. of Am. v. Mehlbrech*, 878 F. Supp. 1382, 1386 (D. Or. 1995) (citing *Taylor v. United States,* 113 F.Supp. 143 (W.D.Ark. 1953)).

In *Rice*, the Tenth Circuit held that "the district court correctly found that federal law generally presumes a person's mental capacity in this context" without explicating a specific federal standard. *Id.* at 1248. Nonetheless, the Tenth Circuit's reliance on 38 C.F.R. § 3.355, which provides the standards applied by the Department of Veterans Affairs in administrative proceedings pertaining to the validity of a beneficiary change, offers some guidance. *Id.*

Under 38 C.F.R. § 3.355(a), testamentary capacity generally "requires that the testator reasonably comprehend the nature and significance of his act, that is, the subject and extent of his disposition, recognition of the object of his bounty, and appreciation of the consequence of his act,

uninfluenced by any material delusion as to the property or persons involved." According to this standard, "[l]ack of testamentary capacity should not be confused with insanity or mental incompetence. An insane person might have a lucid interval during which he would possess testamentary capacity. On the other hand, a sane person might suffer a temporary mental aberration during which he would not possess testamentary capacity." 38 C.F.R. § 3.355(c). Furthermore, "[t]here is a general but rebuttable presumption that every testator possesses testamentary capacity. Therefore, reasonable doubts should be resolved in favor of testamentary capacity." *Id.*

The *Mehlbrech* court adopted a similar standard in its application of the *Taylor* test:

> To be capable of effecting a valid change of beneficiary[,] a person should have clearness of mind and memory sufficient to know the nature of the property for which he [or she] is about to name a beneficiary, the nature of the act he [or she] is about to perform, the names and identities of those who are the natural objects of his [or her] bounty; his relationship towards them, and the consequences of his [or her] act, uninfluenced by any material delusions.

*Mehlbrech* 878 F. Supp. 1386.

In *Rice*, the Tenth Circuit agreed with the Seventh Circuit's claim that "[i]t would be arbitrary to subject issues arising under [a SGLI policy] to the law of a particular state" because "the policy is [generally] issued wherever the soldier happens to be stationed when thoughts of mortality assail him [or her]." *Id.* at 1246 (quoting *Athmer,* 178 F.3d at 475). Alternatively, the court in *Calmon-Hess* argued that because a federal standard is not well-defined, it is helpful to examine state law. *See Calmon-Hess*, 904 F. Supp. 2d 393 (examining New Jersey state law standards pertaining to capacity to contract in the absence of an explicit standard from the Third Circuit).

Under Nevada law, "testamentary capacity exists when the testator (1) comprehends the nature of the act [she or] he is doing, (2) recollects and understands the nature of [her or] his property, and (3) recognizes [her or] his relations to the persons who would inherit via intestacy." *In re Estate of Mallas*, 128 Nev. 906, *2 (2012).

Similarly, in Nevada, "[c]apacity to contract may be partial and its existence in respect of a particular transaction may depend upon the nature of the transaction or upon other circumstances." *Gen. Motors v. Jackson*, 111 Nev. 1026, 1031 (1995) (adopting the Restatement (Second) of Contracts § 12 (1981)). Furthermore, "[a] natural person who manifests assent to a

James C. Mahan
U.S. District Judge

transaction has full legal capacity to incur contractual duties thereby unless he is (a) under guardianship, or (b) an infant, or (c) mentally ill or defective, or (d) intoxicated." *Id.* Accordingly, "the capacity to contract involves a person's *inability* to understand the terms of an agreement, not his [or her] actual understanding." *Id.* (emphasis in original).

Here, the court need not adopt any particular standard to hold that it cannot say, as a matter of law, that the decedent either had or lacked the requisite capacity to change beneficiaries under his VGLI coverage. Lee argues that, as a matter of law, "[the decedent] was lucid at the time of execution." (ECF No. 66 at 10). However, as maintained by Wilson, the exact time of execution is not clear here because the decedent post-dated the beneficiary change form. (ECF No. 61).

It is unclear how much time passed between the decedent's phone call to Prudential—upon which Lee relies significantly when arguing that the decedent had the requisite capacity as a matter of law—and his execution of the beneficiary change form. Similarly, it is not clear whether the decedent was intoxicated at the time of execution. Nor is it clear whether the decedent's decision was the result of rational consideration or delusional action. For example, the decedent's post-dating the beneficiary change form may reflect a conscious decision to ensure that the change was effective, or may instead evidence his disconnection with reality by showing his unawareness of the actual day on which he executed the form.

The circumstances surrounding the decedent's execution of the change of beneficiary form—his separation from his wife of almost thirty years, loss of his job and home, numerous alleged addictions and debts, theft from friends and family, including Lee in the form of unauthorized credit advances, recent and apparently failed attempts to secure work resulting in what seem to be acts of desperation, and alleged connection to a crime-spree spanning from immediately prior to his phone call to Prudential until the time of his death—when taken together, are sufficient to raise a genuine issue of material fact as to his capacity to make the beneficiary change regardless of the specific standard applied. (ECF Nos. 62, 66).

Based upon the record in front of the court, a rational jury could find for either Wilson or Lee depending upon its resolution of relevant factual disputes, thus precluding summary judgment. *See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987) (To

James C. Mahan
U.S. District Judge

establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.").[7]

   c. *Denial of partial summary judgment in favor of Wilson*

Lee argues that the court should deny Wilson's request for 50% of the funds held in the court's registry. *Id.* In her reply, Wilson labels this argument "befuddling" and maintains that "[e]ven if Faith Lee successfully prosecutes this action to final judgment, . . . Petra Wilson is indisputably still entitled to half of the interpleaded funds." (ECF No. 64 at 6) Nonetheless, the court will not release any portion of the funds in advance of a final judgment from the court.

## IV. Conclusion

Accordingly,

IT IS HEREBY ORDERED, ADJUDGED, and DECREED that Wilson's motion for summary judgment (ECF No. 61) be, and the same hereby is, DENIED.

IT IS FURTHER ORDERED, that Lee's motion for summary judgment (ECF No. 66) be, and the same hereby is, DENIED.

DATED July 10, 2018.

_____
UNITED STATES DISTRICT JUDGE

---

[7] Lee argues that Wilson has not carried her burden in proving that the decedent lacked the requisite capacity at the time of execution. (ECF No. 66). However, Wilson need not conclusively prove that the decedent lacked capacity to survive summary judgment; she need only show that resolution of this question is appropriate for a finder of fact and should not be resolved as a matter of law. *See T.W. Elec. Serv., Inc*, 809 F.2d 631.